# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

_____

Hershel Slaughter, Jr.,
     Petitioner


     vs                      Case No. 1:01cv868
                              (Spiegel, J.; Hogan, M.J.)


Anthony Brigano,
     Respondent


_____

## REPORT AND RECOMMENDATION
_____


     Petitioner, an inmate in state custody at the Warren Correctional Institution in Lebanon, Ohio, brings this pro se action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  This matter is before the Court on the petition, respondent's return of writ and petitioner's traverse. (Docs. 1, 5, 6).

### Procedural Background

     On December 24, 1997, the Hamilton County, Ohio, grand jury indicted petitioner on two counts of aggravated murder as defined in Ohio Rev. Code § 2903.01(B) (counts one, two) with specifications, one count of aggravated murder as defined in Ohio Rev. Code § 2903.01(A) (count three) with specifications; one count of aggravated burglary as defined in Ohio Rev. Code § 2911.11(A)(1) (count four); and one count of aggravated robbery as defined in Ohio Rev. Code § 2911.01(A)(3) (count five).  (Doc. 5 at 4, *see* Ex. 1) A jury found petitioner guilty of all charges, except count three. (Doc. 5, Ex. 1). The court sentenced petitioner to consecutive

terms of life with parole eligibility after thirty (30) years for the aggravated murder (count one) and ten years (10) of incarceration for the aggravated robbery (count five). (*Id.,* Ex. 1). No sentence was imposed with respect to counts two and four.  (*Id.*).

With the assistance of counsel, petitioner filed a timely appeal to the Ohio Court of Appeals, raising the following assignments of error:

> 1.  The trial court erred by overruling appellant's motion to suppress evidence.
>
> 2.  The evidence adduced at trial was insufficient as a matter of law to sustain the convictions rendered below.
>
> 3.  The judgment of the trial court is against the manifest weight of the evidence.
>
> 4.  Appellant was denied the effective assistance of counsel at trial.

(Doc. 5, Ex. 6).   On April 28, 2000, the Ohio Court of Appeals overruled the assignments of error and affirmed the judgment of the trial court.  (*Id.,* Exs. 3, 8).

On June 12, 2000, petitioner further appealed through counsel to the Ohio Supreme Court, presenting the following propositions of law:

> 1.  Whether threats made that the accused "will burn" made to an exhausted, intoxicated defendant while in custody for capital murder, along with his mental state, are sufficient to negate a waiver of his Miranda rights or the voluntariness of his statements.
>
> 2.  The judgment of conviction is contrary to law as the evidence presented at trial was insufficient to establish each and every element of the offense beyond a reasonable doubt.
>
> 3.  The judgment of conviction is against the manifest weight of the evidence.

(*Id.*, Ex. 10).  On September 20, 2000, the Ohio Supreme Court denied leave to appeal and dismissed the case as not involving any substantial constitutional question.  (*Id.,* Ex. 12).

2

Petitioner filed the instant petition for a writ of habeas corpus  pursuant to 28 U.S.C. § 2254, raising the following grounds for relief and supporting facts which are quoted verbatim:

Ground One:  Denial of effective assistance of counsel.

> Supporting facts:  Attorney told the jury in opening statements that the defendant had previously broke into the victim's residence. Also, trial counsel failed to address the Jury as to missing evidence ("tape") until closing arguments.

Ground Two:  Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

> Supporting facts:  Police coerced defendant out of his Miranda rights and the tapes favorable to the defendant were missing from the trial.  Also, defendant was intoxicated and under the influence of alcohol and crack cocain [sic] which rendered his statements involuntary.

Ground Three:  Insufficiency of evidence.

> Supporting facts: Evidence was heresay [sic] testimony that didn't corroborate the murder.  The murder weapon has no forensic proof the defendant use [sic] it.  Also, blood splatters from the victim were so severe, yet no trace evidence appear on defendant, or his clothes.

(Doc. 1 at 5-6).

## OPINION

### I. Petitioner has waived his first ground for relief and part of his second ground for relief due to procedural defaults committed in state court.

In his first ground, petitioner alleges that his attorney was constitutionally ineffective because he informed the jury in opening statement that petitioner broke into the victim's residence prior to the crimes, and also failed to address the issue of the missing tape of the police interrogation until closing argument. In his second ground, petitioner alleges, in pertinent part, that the prosecution failed to disclose favorable evidence, specifically a tape of the police interrogation of him.

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state defendant with federal constitutional claims must first fairly present those claims to the state courts for consideration before raising them in a federal habeas corpus action.  *See* 28 U.S.C. § 2254(b)(1), (c)*; see also Anderson v. Harless,* 459 U.S. 4, 6 (1982) (per curiam); *Picard v. Connor,* 404 U.S. 270, 275-76 (1971).  A constitutional claim for relief must be presented to the state's highest court in order to satisfy the fair presentation requirement.  *See O'Sullivan v. Boerckel,* 526 U.S. 838, 845, 848 (1999); *Hafley v. Sowders,* 902 F.2d 480, 483 (6th Cir. 1990); *Leroy v. Marshall,* 757 F.2d 94, 97, 99-100 (6th Cir.), *cert. denied,* 474 U.S. 831 (1985).

If petitioner fails to fairly present his claims through to the state's highest court or commits some other procedural default relied on to preclude review of the merits of petitioner's claims by the state's highest court, and if no avenue of relief remains open or if it would otherwise be futile for petitioner to continue to pursue his claims in the state courts, the petition is subject to dismissal with prejudice on the ground that petitioner has waived his claims for habeas corpus relief.  *See O'Sullivan,* 526 U.S. at 847-848;  *Harris v. Reed,* 489 U.S. 255, 260-62 (1989); *McBee v. Grant,* 763 F.2d 811, 813 (6th Cir. 1985); *see also Weaver v. Foltz,* 888 F.2d 1097, 1099 (6th Cir. 1989).  If, because of a procedural default, petitioner has not had his claims considered by the state's highest court and he can no longer present his claims to the state courts, he has waived the claims for purposes of federal habeas corpus review unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional errors, or that failure to consider the claims will result in a

4

"fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722, 750 (1991); *see also Murray v. Carrier,* 477 U.S. 478, 485 (1986); *Engle v. Isaac,* 456 U.S. 107, 129 (1982); *Wainwright v. Sykes,* 433 U.S. 72, 87 (1977).

A "fundamental miscarriage of justice" occurs only in the "extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray,* 477 U.S. at 495-96; *see also Schlup v. Delo,* 513 U.S. 298, 327 (1995). To be credible, such a claim "requires petitioner to support his allegations of constitutional error with new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence–that was not presented at trial." *Schlup,* 513 U.S. at 324. In order to obtain habeas review of the merits of a procedurally-defaulted claim under the "actual innocence" exception, the otherwise-barred petitioner "must show it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt" in light of all the evidence, "including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial." *Id.* at 327-28.

In this case, although petitioner did present one of his ineffective assistance of counsel claims to the Ohio Court of Appeals, petitioner did not present either of his claims, asserted as ground one in the petition, to the Ohio Supreme Court on direct appeal. Also, petitioner failed to present his claim that the state failed to disclose favorable evidence, asserted in ground two of the petition, to any Ohio appellate court. Petitioner committed a procedural default by failing to present these claims to Ohio's courts on direct appeal. *See Leroy,* 757 F.2d at 97, 99-100. He has waived the claims for purposes of federal habeas corpus review because he did not provide the highest state court in Ohio with an opportunity to correct any alleged constitutional error. *See id.*; *see also Hughes v. Idaho State Bd. of Corrections,* 800 F.2d 905, 907-08 (9th Cir. 1986).

Therefore, this Court may not consider these claims unless he shows cause for the default and actual prejudice as a result of the alleged errors, or demonstrates that failure to consider the claims will result in a "fundamental miscarriage of justice." *See Coleman,* 501 U.S. at 750; *see also Murray,* 477 U.S. at 485; *Isaac,* 456 U.S. at 129; *Sykes,* 433 U.S. at 87. As cause for the default of his ineffective assistance of trial counsel claims, petitioner alleges that his appellate counsel was ineffective for failing to present the claims to the Ohio Supreme Court.

Ineffective assistance of appellate counsel may constitute cause for a procedural default. *Murray,* 477 U.S. at 488. The constitutional right to have counsel appointed extends to the first appeal of right, and not to a discretionary appeal on direct review of a conviction. *Pennsylvania v. Finley,* 481 U.S. 551 555 (1987); *Ross v. Moffitt,* 417 U.S. 600 (1974). Petitioner's appeal to the Ohio Supreme Court is a discretionary appeal which the Ohio Supreme Court may allow or disallow. Rule II, Section 1(A)(3) of the Rules of Practice of the Supreme Court of Ohio. Therefore, petitioner does not have a constitutional right to the assistance of counsel during that appeal. Since there is no constitutional right to counsel on appeal to the Ohio Supreme Court, there is no constitutional right to the effective assistance of counsel during that proceeding. *Cf. Coleman,* 501 U.S. at 752; *Wainwright v. Torna,* 455 U.S. 586, 587-88 (1982). For this reason, counsel's failure to present petitioner's ineffective assistance of trial counsel claims on appeal to the Ohio Supreme Court cannot constitute cause excusing petitioner's procedural default. *Cf. Coleman,* 501 U.S. at 757; *Hernandez v. Terhune,* 27 Fed.Appx 841, 843, 2001 WL 1480671, at *1 (9th Cir. Nov. 20, 2001), *cert. denied,* 536 U.S. 924 (2002); *Riggins v. Turner,* No. 95-4027, 1997 WL 144214, at **2 (6th Cir. March 27, 1997); *Turner v. Farley,* No. 93-3821, 1995 WL 251003, at **3 (7th Cir. April 28, 1995).

Petitioner has not provided any justification for the procedural default of his claim that the state withheld evidence. Moreover, petitioner has not demonstrated that failure to consider his ineffective assistance of trial counsel claims or his withholding of evidence claim will result in a fundamental miscarriage of justice because of his actual innocence. Accordingly, petitioner has waived these claims for purposes of federal habeas corpus review.[1]

## II. Petitioner is not entitled to habeas corpus relief based on his claims that

---

[1]Assuming, arguendo, that petitioner had not waived these claims, they would be found to be lacking in merit. Trial counsel informed the jury that petitioner previously broke into the victim's residence resulting in a restraining order, so that petitioner would have an excuse for failing to call 911 when he found the victim dead. (Doc. 13, Tr. 1112). Petitioner has not shown that trial counsel's failure to address the issue of the missing interrogation tape until the closing argument (Doc. 13, Tr. 1129) resulted in prejudice to the defense because there was no evidence that the tape had information favorable to petitioner. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). For this same reason, the prosecution did not commit a violation under *Brady v. Maryland*, 373 U.S. 83, 87 (1963) in failing to turn over the missing interrogation tape.

**the waiver of his *Miranda* rights and the statements made to police were involuntary or unintelligent, as asserted in his second ground for relief.**

In his second ground for relief, petitioner argues that he did not knowingly, intelligently and voluntarily waive his rights under *Miranda v. Arizona*, 384 U.S. 436 (1996) and that the statements made to police were not voluntary in violation of the Due Process Clause. The Ohio Court of Appeals characterized petitioner's argument in the state court as follows: "He argues that, at the time of questioning, he was intoxicated and exhausted, and that protracted and aggressive interrogation by police in which they threatened and cursed at him, negated his waiver of his *Miranda* rights and rendered his statements involuntary." (Doc. 5, Ex. 3 at 3-4).

Under the standard established by the Antiterrorism and Effective Death Penalty Act (AEDPA), codified principally at 28 U.S.C. § 2254 (d), petitioner is not entitled to federal habeas corpus relief, unless the state court's adjudication of his claim resulted in a decision that (1) was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. *See* 28 U.S.C. § 2254(d); *see also Williams v. Taylor,* 529 U.S. 362, 402-03 (2000) (O'Connor, J., writing for majority on this issue); *Harris v. Stovall,* 212 F.3d 940, 942 (6th Cir. 2000), *cert. denied,* 532 U.S. 947 (2001); *Harpster v. Ohio,* 128 F.3d 322, 326 (6th Cir. 1997), *cert. denied,* 522 U.S. 1112 (1998). A state court decision is "contrary to" clearly established federal law as determined by the Supreme Court under § 2254(d)(1) if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams,* 529 U.S. at 405-06 (O'Connor, J.); *Harris,* 212 F.3d at 942.

An "unreasonable application" of Supreme Court precedent occurs (1) if the state court identifies the correct legal standard but unreasonably applies it to the facts of the case, or (2) if the state court either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Williams,* 529 U.S. at 407-08 (O'Connor, J.). Under § 2254(d)(1)'s "unreasonable application" clause, a federal habeas corpus court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application

7

must also be unreasonable." *Id.* at 411 (O'Connor, J.); *see also McGhee v. Yukins,* 229 F.3d 506, 510 (6th Cir. 2000); *Harris,* 212 F.3d at 942. The reasonableness inquiry is an objective one; it does not involve a subjective inquiry into whether or not reasonable jurists would all agree that the state court's application was unreasonable. *Williams,* 529 U.S. at 409-10 (O'Connor, J.); *see also Washington v. Hofbauer,* 228 F.3d 689, 698 (6th Cir. 2000); *Harris,* 212 F.3d at 942-43. Moreover, the writ may issue only if the application is objectively unreasonable "in light of the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision." *McGhee,* 229 F.3d at 510, 512 (citing *Williams,* 529 U.S. at 412).

The Ohio Court of Appeals made the following factual findings concerning petitioner's admissions during questioning by police which are entitled to a presumption of correctness:[2]

> Initially, appellant claimed that he had gone to Antoinette's apartment and had found her dead. He panicked and ran out of the apartment because he knew he should not have been there because of the restraining order against him. Upon further questioning, appellant admitted that, upon entering the apartment, he had talked to Antoinette and then he had blacked out. Upon awakening, he found her covered in blood. He also acknowledged stealing her stereo to make it look as if a robbery had occurred.

(Doc. 5, Ex. 3 at 3). The state appellate court addressed petitioner's claims, as follows:

> Tape recordings of appellant's statements to the police were entered into evidence at the hearing on appellant's motion to suppress. The record reveals that the police advised appellant of his *Miranda* rights on several occasions. He read and signed a waiver-of-rights form, which he appeared to understand. Evidence of a written waiver form signed by

---

[2]28 U.S.C. § 2254(e)(1) provides that "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed correct" unless petitioner rebuts the presumption by "clear and convincing evidence." Petitioner failed to rebut the court's findings with clear and convincing evidence.

the accused is strong proof that the waiver is valid. The tapes also show that appellant deliberately and knowingly declined to consult with an attorney until the end of the interrogation. When he finally asked to see an attorney, questioning immediately ceased.

Appellant argues that he was severely intoxicated at the time of the interrogation, and, therefore, that he could not have made a knowing waiver of his rights or a voluntary confession. While the police officers acknowledged that appellant had a slight to moderate odor of alcohol and that he was "under the influence of alcohol," they testified that he was not so intoxicated that he did not know what he was doing. The trial court believed their testimony. Matters as to the credibility of witnesses at a suppression hearing are for the trier of fact to decide. Further, intoxication, in and of itself, is not sufficient to render a confession involuntary. In the tapes, appellant slurred his words somewhat, but he was generally responsive and answered questions appropriately, if belligerently. Under the circumstances, we cannot hold that his intoxication rendered his statements involuntary.

Appellant also contends that the length and intensity of the interrogation, as well as the use of threats by officers, rendered his statements involuntary. Though the interrogation lasted several hours, the record shows that it was not inordinately long and that at least one break was taken. At one point, appellant claimed to be cold, and, very late in the interview, he stated that he was tired. However, he does not contend that he was denied food, drink or access to a restroom.

The tapes do show that the interrogation was, at times, intense, that the exchanges between appellant and the officers were heated, and that the language used by all parties was course. Appellant was combative and the officers, at times, responded in kind. Additionally, the officers told appellant that "his ass would burn" in the courtroom and in hell. While, generally, courts consider threats to be coercive police conduct, we consider these statements to be relatively minor because they were obviously beyond the officers' ability to carry out. They are not nearly as serious as more specific threats, such as threats to charge the accused with other, separate offenses, to charge the accused with a greater offense, or to arrest and charge the accused's girlfriend if the

9

accused does not confess.

Further, the tapes show that no incriminating statements resulted from any threats and that appellant's will was not overborne or his capacity for self-determination impaired due to threats or coercive police conduct. Appellant's story at the start of the interview was that he had found his wife dead and that he had fled from the apartment in a panic. He never changed that story in response to threats or aggressive police questioning. He simply became more combative himself, and he never actually admitted to committing the murder. It was only during a later interview, under gentler questioning from a more sympathetic officer who had known appellant from his neighborhood while growing up, that appellant made more incriminating statements.

In sum, considering the totality of the circumstances, we hold that appellant's statements were not the result of coercive police misconduct and that he adequately understood his circumstances and the consequences of the decision to waive his rights. The state proved by a preponderance of the evidence that he had made a knowing, intelligent and voluntary waiver of his *Miranda* rights and a voluntary confession.

(Doc. 5, Ex. 3 at 5-7).

The Fifth Amendment provides: "No person . . . shall be compelled in any criminal case to be a witness against himself." In *Miranda,* the Supreme Court recognized that the atmosphere of custodial interrogation in and of itself is inherently coercive. *Miranda,* 384 U.S. at 458. In order to ensure the Fifth Amendment privilege against self-incrimination is not undermined in such a situation, the Supreme Court established certain procedural safeguards for counteracting the compelling pressures inherent in the custodial interrogation setting. *See id.* at 444. Specifically, *Miranda* requires that prior to any questioning in such a setting, the person being interrogated must be warned he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney. *See id.* "The Court's fundamental aim in designing the *Miranda* warnings was 'to assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process.'" *Colorado v. Spring,* 479 U.S. 564, 572 (1987) (quoting *Miranda,* 384 U.S. at 469). The Supreme Court has held that "*Miranda* announced a constitutional rule that Congress may not

10

supersede legislatively." *Dickerson v. United States,* 530 U.S. 428, 444 (2000). Following the rule of stare decisis, the Court further declined to overrule the *Miranda* decision, which "has become embedded in the routine police practice to the point where the warnings have become part of our national culture." *Id.*

To ensure that law enforcement officials comply with *Miranda*'s requirements, the Supreme Court long ago established an exclusionary rule, holding that statements obtained in violation of *Miranda* must be excluded from the prosecution's case-in-chief even if the statements are otherwise voluntary within the meaning of the Fifth Amendment. *Oregon v. Elstad,* 470 U.S. 298, 307 (1985). The failure to administer *Miranda* warnings creates an irrebuttable presumption of compulsion, requiring the suppression of the accused's statements for purposes of the prosecution's case-in-chief. *Id.* at 306-07 and n.1.

A suspect may waive his *Miranda* rights after receiving the required warnings and agree to answer questions or make a statement during custodial interrogation, "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda,* 384 U.S. at 444; *see also Spring,* 479 U.S. at 572; *Moran v. Burbine,* 475 U.S. 412, 421 (1986). In such a case, the suspect's statements are not "compelled" within the meaning of the Fifth Amendment and may be introduced against him in the prosecution's case-in-chief without implicating constitutional concerns. *See Spring,* 479 U.S. at 573. The question whether an accused has validly waived his *Miranda* rights involves two distinct inquiries: (1) whether the relinquishment of the right was "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception;" and (2) whether the waiver was made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran,* 475 U.S. at 421; *see also Spring,* 479 U.S. at 573. "Only if the 'totality of the circumstances surrounding the interrogation,'" including the background, experience, and conduct of the accused, "reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Moran,* 475 U.S. at 421 (quoting *Fare v. Michael C.,* 442 U.S. 707, 725 (1979)); *see also North Carolina v. Butler,* 441 U.S. 369, 374-75 (1979) (citing *Johnson v. Zerbst,* 304 U.S. 458, 464 (1938)).

In determining whether a valid waiver has been made, the Court need not inquire into the state of mind of the police, which is "irrelevant to the question of the intelligence and voluntariness of the suspect's election to abandon his rights." *See*

*Moran,* 475 U.S. at 423. In addition, the "Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege," such as that he may be questioned and his statements used against him in a different criminal investigation. *Spring,* 479 U.S. at 574. Nor does the Constitution require the police to "supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." *Moran,* 475 U.S. at 422. As long as a suspect's voluntary decision to speak to law enforcement officials is made with full awareness and comprehension of all the information *Miranda* requires the police to convey–i.e., that he has the constitutionally-protected right to remain silent and to have an attorney present during custodial interrogation, and that whatever he chooses to say in response to police questioning may be used as evidence against him–his waiver is knowing and intelligent within the meaning of *Miranda.* *See Spring,* 479 U.S. at 574-75; *see also Moran,* 475 U.S. at 422-24.

The Court is mindful that on federal habeas corpus review of petitioner's state conviction, petitioner has the burden of proving that he did not competently and intelligently waive his constitutional rights. *Johnson,* 304 U.S. at 468-69 (involving waiver of right to assistance of counsel). Although the ultimate determination of a valid *Miranda* waiver is a mixed question of law and fact not subject to the presumption of correctness, *see, e.g.,Taylor v. Rogers,* 97 F.3d 1452 (table), No. 95-3904, 1996 WL 515349, at **3 (6th Cir. Sept. 10, 1996) (per curiam) (citing *Miller v. Fenton,* 474 U.S. 104, 115 (1985)), the state court's factual findings supporting its waiver determination are presumed correct under 28 U.S.C. § 2254(e)(1). *See id.* Moreover, in this federal habeas corpus proceeding, the state court's disposition of petitioner's *Miranda* claim will not be overturned unless it (1) was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, or (2) was based on an unreasonable determination of the facts in light of the record evidence. 28 U.S.C. § 2254(d); *Williams,* 529 U.S. at 402-03; *Harris,* 212 F.3d at 942.

As the Ohio Court found and as the record demonstrates petitioner was informed of his *Miranda* rights on several occasions, when he was taken into custody, when he arrived at the station for questioning and when a second interview commenced by a new detective. (Tr. 102, 116-117, 160, 930-931). Petitioner signed and initialed a written waiver form. ( Tr. 930-931, 181).The Ohio court also found that petitioner appeared to understand his rights. (Doc. 5, Ex. 3 at 5). Petitioner indicated that he understood his rights and it appeared to the officers that he did, as

well.  (Tr. 116, 119, 181, 930-931).  Petitioner had a GED and stated that he could read and write. (Tr. 118).

Intoxication does not necessarily invalidate a *Miranda* waiver.  *July v. Champion*, No. 00-7029, 2000 WL 1040316, at **2 (10th Cir. July 28, 2000); *United States v. Korn,* 138 F.3d 1239, 1240 (8th Cir.)(and cases cited therein), *cert. denied,* 525 U.S. 947 (1998); *cf. Givens v. Yukins,* No. 98-2429, 2000 WL 1828484, at **9-11 (6th Cir. Dec. 5, 2000).  As the state appellate court found, while most of the police officers who came into contact with petitioner acknowledged that he smelled of alcohol, none believed him to be so intoxicated that he didn't understand his rights or that he was waiving them. (Tr. 119, 134, 931).  Moreover, there is nothing on the interview transcripts which indicates that petitioner was incoherent or acting strangely.  The record supports the conclusion that petitioner waived his Miranda rights intelligently, i.e., with full awareness and comprehension of all the information that *Miranda* requires police to convey.

The record further supports the conclusion that petitioner waived his *Miranda* rights voluntarily.  There is absolutely no evidence that the police coerced him into waiving his rights. The police tactics that defense counsel raised as objectionable during the suppression hearing were all directed to encouraging petitioner to describe his involvement in the offense after he had waived his rights.  None were intended to force petitioner to waive his rights.  Moreover, there is no evidence that he was under the influence of alcohol to the extent that his waiver was not voluntary.  Accordingly, the record also supports the conclusion that petitioner waived his *Miranda* rights voluntarily.

The Fifth Amendment prohibits the use of a defendant's compelled testimony by the prosecution in its case-in-chief.  *Oregon v. Elstad,* 470 U.S. 298, 306-07 (1985).   The Due Process Clause of the Fourteenth Amendment also prohibits the admission of coerced confessions procured by means "so offensive to a civilized system of justice that they must be condemned." *Miller v. Fenton,* 474 U.S. 104, 109 (1985).  An admission is deemed to be coerced where the conduct of law enforcement officials was such as to overbear the accused's will to resist, thus bringing about a confession not freely self-determined. *Beckwith v. United States,* 425 U.S. 341, 347-48 (1976) (quoting *Rogers v. Richmond,* 365 U.S. 534, 544 (1961)).  The ultimate question in coerced confession cases is whether the confession was voluntary, or in other words, "the product of an essentially free and unconstrained choice by its maker." *Schneckloth v. Bustamonte,* 412 U.S. 218, 225 (1973).

An involuntary confession may result from psychological as well as physical coercion on the part of law enforcement officials. *Arizona v. Fulminante,* 499 U.S. 279, 285-89 (1991); *Miranda v. Arizona,* 384 U.S. 436, 448 (1966). However, because interrogation is considered an essential tool in solving crime, the Supreme Court has not gone so far as to prohibit custodial interrogation or psychological tactics per se. *See Miranda,* 384 U.S. at 481; *Haynes v. Washington,* 373 U.S. 503, 514-15 (1963); *Stein v. New York,* 346 U.S. 156, 184 (1953), *overruled in part on other grounds by Jackson v. Denno,* 378 U.S. 368 (1964); *see also Frazier v. Cupp,* 394 U.S. 731, 737-39 (1969); *Ledbetter v. Edwards,* 35 F.3d 1062, 1067 (6th Cir. 1994), *cert. denied,* 515 U.S. 1145 (1995). The limits on police conduct in cases such as this involving a claim of psychological coercion during interrogation will depend upon a weighing of the circumstances of pressure against the power of the confessor's resistance. *Stein,* 346 U.S. at 184-85. In assessing the merits of such a claim, the court must consider the effect the totality of the circumstances had upon the will of the accused. This approach requires the reviewing court to examine the conduct of the police in eliciting the confession, the characteristics of the accused as bearing on his capacity to resist police pressure, and the details of the interrogation. *Schneckloth,* 412 U.S. at 226; *see also Mincey v. Arizona,* 437 U.S. 385, 398-402 (1978). Relevant factors to consider in assessing the totality of circumstances include the age, education and intelligence of the accused; whether the accused has been informed of his constitutional rights; the length and extent of the questioning; and the use of physical punishment, such as the deprivation of food or sleep. *Schneckloth,* 412 U.S. at 226; *see also United States v. Mahan,* 190 F.3d 416, 422-23 (6th Cir. 1999) (citing *Ledbetter,* 35 F.3d at 1067).

The criminal defendant has no constitutional right "to confess to his crime only when totally rational and properly motivated." *Colorado v. Connelly,* 479 U.S. 157, 166 (1986). The influence of drugs or alcohol does not render a suspect's confession invalid especially if the suspect was not incapacitated. *See United States v. Losoya,* No. 96-50426, 1997 WL 664967, at **1 (9th Cir. Oct. 10, 1997), *cert. denied,* 522 U.S. 1131 (1998); *United States v. George*, 987 F.2d 1428, 1430-1431 (9th Cir. 1993). If, as in this case, a petitioner answers questions appropriately and coherently, cooperates with the police and follows orders (Tr. 119, 905-906, 931, 1023, 1030), intoxication does not negate the voluntariness of his confession. *Cf. United States v. Allen,* 40 Fed.Appx. 313, 314, 2002 WL 1402072, at **1 (8th Cir. July 1, 2002) (police officers testified that suspect was "calm, alert, oriented, and appropriately answered questions," despite being under the influence); *Medeiros v. Shimoda*, 889 F.2d 819, 823 (9th Cir. 1989) (although intoxicated, suspect obeyed orders, cooperated in

14

conversing with police and drove a car), *cert. denied,* 496 U.S. 938 (1990)).

Although petitioner complained that he was tired toward the end of his interviews (Tr. 236, 245, 1049), and at one point stated that he was cold (Tr. 255, 1049), there was no evidence that he was incapacitated by exhaustion or that the cold was prolonged or that the officers were depriving him of any necessities during his interrogation. Indeed he was provided with coffee and a cigarette during the break between interviews. (Tr. 1050). His interrogation lasted between four and five hours. (Tr. 146, 930, 1050). He was questioned for about two hours from 10:30 pm to 12:30 am and then given a break, after which an interview with another detective commenced and then ended by about 2:30 am (Tr. 1049-1050). From a review of the interview transcript, it certainly seems that throughout the interrogation petitioner seemed very alert, answering questions aggressively and at times, combatively. Petitioner's interrogation was not unduly lengthy to the extent that it supported a finding of coercion. *See, e.g., Davis v. North Carolina,* 384 U.S. 737, 752 (1966) (suspect isolated for several weeks); *Haynes v. Washington,* 373 U.S. 503, 510-12 (1963) (suspect held for five days); *Ashcraft v. Tennessee,* 322 U.S. 143, 154 (1944) (thirty-six hour interrogation with single five minute break); *United States v. Haswood,* 350 F.3d 1024, 1027 (9th Cir. 2003) (assuming interrogation lasted for entire day, "coercion typically involves more outrageous conduct"). Moreover, an overnight interrogation, questioning a suspect late at night and through the early morning hours, has been expressly approved by the United States Court of Appeals for the Sixth Circuit. *Ledbetter,* 35 F.3d at 1069.

There is no evidence in the record even remotely suggesting that petitioner was threatened with physical harm. The police used a number of psychological tactics to get him to talk, such as suggesting the whole event was a big accident (Tr. 1041) or softening him up by being nice to him (Tr. 245, 249), and at times, crude language was used by the petitioner and his interrogators. (Tr. 207). Petitioner, however, showed no signs of cowering or giving in. (*See, e.g.,* Tr. 220-221). Petitioner contends that the following exchange included a threat rendering the interrogation coercive:

A. Oh, man shut the – Look, look. Ain't nothing I can say right now, whether for, whether it is right or wrong to either one of you all, because it isn't going to do me any good.

I don't know why the fuck I did it. I was – I was on Vine. I don't know what the fuck I was feeling. I know I had to get the fuck away from

15

there.  Not because wasn't worried about her.  I was thinking about me.

Q.  Because you just killed your wife.  That's why.

A.  Man, if you want to cut my god damn –

Q.  That's the only reason why.

A.  – big ass –

Q.  That's the only reason for you to leave.

A.  Yeah?

Q.  That is the only reason for you to leave there –

A.  Shut your fucking mouth.

Q.  – without calling the police, because you murdered your wife –

A.  Is that right?

Q.  – and you knew you did it.

A.  Is that right?

Q.  If you didn't kill your wife, you'd have stayed there.

A.  Is that right?

Q.  You'd have waited for paramedics to get there; you would have waited for the police and you'd have given a god damn statement.

A.  You're out of your fucking (unintelligible).

Q.  You're out of your mind, pal.  *If you go into court with that story and your ass is going to burn.  And your ass is not only going to burn here on earth, you're going to burn in hell.*

A.  Is that right?

Q.  Because that's where you're going to go?

A.  Is that right?

(Tr. 218-219) [italics added]. The detectives are suggesting to the petitioner that if he persists in his story that he left his dead wife without calling for help because he was violating the restraining order, the jury would not believe him and would likely convict him. They would assume that an innocent man would have remained on the scene, sought help and given a statement to police.  Although the language was inappropriate, the police were not actually even threatening petitioner but merely advising him of the likely consequences of presenting his untruthful version of the events to the court.  Moreover, petitioner did not appear intimidated in the least.  Throughout the interviews, petitioner did not express any reluctance to talk to the police, and talked rather freely and extensively.  He did not ask for an attorney until the very end, and at that time, questioning ceased. (Tr. 264).

It is clear from the record that petitioner was advised prior to questioning of his *Miranda* rights, indicated he understood his rights, and signed a form waiving such rights.  Petitioner's will to resist police pressure was not compromised by his intelligence, education, age or experience.  He was forty nine years old at the time of the interrogation, had a GED, seemed to understand everything that was going on and was no stranger to the criminal justice system.  (Tr. 118, 180, 1023, 1030; Doc. 5, Ex. 3 at 2).  Considering the totality of circumstances in this case, this Court concludes that petitioner's statements were voluntary because petitioner's will was not overborne.  In fact, petitioner did not confess to the murder of his ex-wife, but merely admitted to being at the scene.

Upon an independent review of the record of the suppression hearing and of the trial held in this case, this Court concludes that the Ohio Court of Appeals' disposition of petitioner's claim challenging the constitutionality of admitting his statements to the police and of the waiver of his *Miranda* rights  was  reasonable in light of the record evidence and was neither contrary to nor involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court.  Accordingly, petitioner is not entitled to habeas corpus relief with respect to these claims.

17

### III. Petitioner is not entitled to habeas corpus relief with respect to his third claim that the evidence was insufficient to support his convictions.

As his third ground for relief, petitioner argues that the evidence was insufficient to support his convictions.

The Due Process Clause requires a state to prove beyond a reasonable doubt every fact necessary to constitute the charged offense. *In Re Winship,* 397 U.S. 358, 363-64 (1970). When petitioner raises an insufficiency of evidence claim in a petition for a writ of habeas corpus, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original). The *Jackson* standard must be applied with explicit reference to the criminal offense as defined by state law. *Scott v. Perini,* 662 F.2d 428, 431 (6th Cir. 1981) (quoting *Jackson,* 443 U.S. at 324 n.16), *cert. denied,* 456 U.S. 909 (1982). Any conflicting inferences arising from the record must be resolved in favor of the prosecution. *See Walker v. Engle,* 703 F.2d 959, 969-70 (6th Cir.), *cert. denied,* 464 U.S. 951, 962 (1983). It is beyond the province of the court to weigh the credibility of witnesses, and credibility conflicts must be resolved in favor of the prosecution. *Id.* It is the trier of fact's responsibility to resolve conflicts in testimony and to weigh the evidence. *Jackson,* 443 U.S. at 319. Consequently, the reviewing court may not substitute its own opinion for that of the trier of fact which convicted the petitioner. *Id.* at 318-19; *York v. Tate,* 858 F.2d 322, 329 (6th Cir. 1988) (per curiam), *cert. denied,* 490 U.S. 1049 (1989).

The Ohio Court of Appeals made the following findings of fact which are entitled to a presumption of correctness:

> On December 13, 1997, appellant's ex-wife, Antoinette Slaughter, was found dead in her apartment. She had been struck in the head at least four times with a lead pipe while she lay in bed. Even though appellant and the victim had been divorced for over ten years at the time of the murder, their relationship had continued and appellant had often stayed with his ex-wife. Nevertheless, their relationship was stormy and they argued constantly. The state presented evidence that appellant frequently imposed himself upon Antoinette and that she only reluctantly allowed him to stay at her residence. Weeks before the murder, appellant had broken into Antoinette's residence. He was convicted of trespass as a

18

result of that incident and was order to stay away from her.

The tension between the pair escalated when Antoinette started seeing another man. Shortly before the murder, appellant told a friend, Natalie Fields, that he wanted to beat his ex-wife. On December 12, 1997, the night before the murder, family members observed appellant and Antoinette arguing. They testified that appellant had grabbed Antoinette by the shoulders and had threatened her about her new boyfriend.

The following morning, appellant called his mother and told her to have his daughter, Dorthea Slaughter, check on Antoinette. Upon receiving her grandmother's phone call, Dorthea went to Antoinette's residence and found the screen door on the patio ajar. In the apartment, she discovered her mother's badly beaten body covered in blood, and she called the police. Later that day, appellant called her and asked her if she had checked on her mother. When she told appellant that Antoinette was dead, appellant hung up.

The police put out a flyer indicating that appellant was wanted for questioning in connection with the homicide. That evening, he was arrested at gunpoint and taken in for questioning. Initially, appellant claimed that he had gone to Antoinette's apartment and had found her dead. He panicked and ran out of the apartment because he knew he should not have been there because of the restraining order against him. Upon further questioning, appellant admitted that, upon entering the apartment, he had talked to Antoinette, and then he had blacked out. Upon awakening, he found her covered in blood. He also acknowledged stealing her stereo to make it look as if a robbery had occurred.

The police discovered the stereo in Field's apartment. Fields testified that, a few days before the murder, appellant had asked her if she wanted to buy a stereo. Shortly after the time of the murder, appellant called her from a pay phone near Antoinette's apartment and told her he had the stereo. He subsequently sold it to her for fifty dollars' worth of crack cocaine. He left Field's apartment for several hours and returned the next morning. He was very tired, and before he fell asleep, he told Fields that his wife was dead. Fields believed that his statement was a

19

ploy to get more drugs from her.  He questioned him further, and he stated, "It wasn't worth it."

(Doc. 5, Ex. 3 at 2-3).

Petitioner argues in the instant case, as he did in his state appeal, that the lack of physical evidence, such as blood on his clothing or fingerprints on the pipe (the murder weapon), demonstrates the insufficiency of the evidence.  Citing Ohio court decisions, the state court rejected petitioner's argument, finding that circumstantial evidence is as valid as direct evidence and concluding that the circumstantial evidence in this case amply supported the convictions. (Doc. 5, Ex. 3 at 8).  In assessing the sufficiency of evidence under *Jackson*, circumstantial evidence alone may be sufficient to sustain a conviction.  *Dixon v. Miller,* 293 F.3d 74, 81 (2nd Cir.), *cert. denied,* 537 U.S. 955 (2002); *United States v. Jones*, 102 F.3d 804, 807 (6th Cir. 1996); *Jamison v. Collins,* 100 F.Supp.2d 647, 705 (S.D. Ohio 2000), *aff'd*, 291 F.3d 380 (6th Cir. 2002).  Accordingly, the state court's reliance on circumstantial evidence does not invalidate its conclusion.

In the instant case, petitioner further argues that his convictions were invalid because they were  based on hearsay evidence. Petitioner fails to point to any specific hearsay evidence in the record.  Moreover, he did not present this particular argument to the state appellate court and  therefore, the issue is waived.

Section 2911.01 (A)(3), the aggravated robbery statute,  provides:

(A) No person, in attempting or committing a theft offense . . . shall do any of the following:

. . .

(3) Inflict or attempt to inflict, serious physical harm on another.

The record demonstrates that petitioner took his ex-wife's stereo without her consent after murdering her.  He admitted to taking the stereo, and it was recovered from the home of his friend Ms. Fields who testified that he sold it to her immediately after the murder. (Tr. 874, 880, 964).  He, therefore, committed a theft offense while inflicting serious physical harm on his ex-wife, amounting to aggravated robbery.

20

Section 2911.11 (A) (1) of the Ohio Rev. Code defines the aggravated burglary offense, in pertinent part, as follows:

(A) No person, by force, stealth, or deception, shall trespass in an occupied structure . . . when another person other than an accomplice of the offender is present, with purpose to commit in the structure . . . any criminal offense, if any of the following apply:

(1) The offender inflicts, or attempts or threatens to inflict physical harm on another . . .

Section 2911.21 of the Ohio Rev. Code defines trespass, as follows:

(A) No person, without privilege to do so, shall do any of the following:

(1) Knowingly enter or remain on the land or premises of another.

The evidence shows that petitioner entered his ex-wife's apartment by force, i.e., pushing in the door while she was there and killed her  (Tr. 952, 195-196), supporting an aggravated burglary conviction.

R.C. 2903.01 (B), the aggravated murder offense of which petitioner was convicted, states in pertinent part:

(B) No person shall purposely cause the death of another while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit . . . aggravated robbery . . . aggravated burglary . . . .

While petitioner did not confess to the murder, he did admit that he climbed over the balcony, pushed the door open, found his ex-wife in bed and then blacked out, only to discover her in a pool of blood when he awoke.  He then fled with the victim's stereo. (Tr. 947-964).  He suspiciously called his mother, asking her to call the victim's daughter and have her check on her mother.  (Tr. 717, 786).  The day before the murder, petitioner told a friend that he wanted to beat his ex-wife, apparently because he was jealous of her new boyfriend. (Tr. 872). This circumstantial evidence supports an aggravated murder conviction.

21

Viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that petitioner committed the aggravated murder, aggravated robbery and aggravated burglary offenses beyond a reasonable doubt. Accordingly, this Court concludes that the ruling of the Ohio Court of Appeals on the sufficiency of evidence with respect to these crimes comports with the Supreme Court's *Jackson* standard and was based on a reasonable assessment of the facts in light of the record evidence. Petitioner is therefore not entitled to habeas corpus relief with respect to his insufficiency of evidence claim, asserted in ground three.

## IT IS THEREFORE RECOMMENDED THAT:

1.  Petitioner's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be DENIED with prejudice.

2.  A certificate of appealability should not issue with respect to the dismissal on procedural default grounds of the claim for relief alleged in the petition as ground one and with respect to the dismissal on procedural default grounds of petitioner's claim that the state withheld evidence alleged in the petition as ground two  because "jurists of reason would not find it debatable whether this Court is correct in its procedural ruling" as required under the first prong of the two-part standard enunciated in *Slack v. McDaniel,* 529 U.S. 473, 484-85 (2000), which is applicable to procedurally-barred claims.[3]  A certificate of appealability also should not issue with respect to petitioner's claim challenging the validity of his waiver of Miranda rights and his admissions to police alleged in the petition as ground two and petitioner's claim alleged in ground three, which this Court has considered on the merits, because for the foregoing reasons, petitioner has failed to make a substantial showing of the denial of a constitutional right remediable in this federal habeas corpus proceeding.

---

[3]Because this Court finds petitioner has not met the first prong of the *Slack* standard, it need not address the second prong of *Slack* as to whether "jurists of reason" would find it debatable whether grounds one and two state valid constitutional claims.  *See Slack,* 529 U.S. at 484.

*See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).  Petitioner has not shown that reasonable jurists could debate whether these claims should have been resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell,* 537 U.S. 322, 323-324 (2003) (quoting *Slack,* 529 U.S. at 483-84) (in turn quoting *Barefoot v. Estelle,* 463 U.S. 880, 893 n.4 (1983)).

     3.  With respect to any application by petitioner for *in forma pauperis* status for the purposes of pursuing an appeal of an order adopting this report and recommendation,  this Court certify that pursuant to 28 U.S.C. § 1915 (a) an appeal of this order would not be taken in "good faith," and, therefore, DENY petitioner leave to proceed on appeal *in forma pauperis*.   *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman,* 117 F.3d 949, 952 (6th Cir. 1997).

Date:  May 14, 2004                S/Timothy S. Hogan
      hr                                          Timothy S. Hogan
                                               United States Magistrate Judge

J:\ROSENBEH\2254(2004)\01-868vol&waiv&suff.wpd

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

---

Hershel Slaughter, Jr.,
     Petitioner


    vs                           Case No. 1:01cv868
                                     (Spiegel, J.; Hogan, M.J.)


Anthony Brigano,
     Respondent

---

## NOTICE

Attached hereto is a Report and Recommendation issued by the Honorable Timothy S. Hogan, United States Magistrate Judge, in the above-entitled action. Pursuant to Fed. R. Civ. P. 72(b), any party may object to the Magistrate Judge's Report and Recommendation within ten (10) days after being served with a copy thereof.   Such party shall file with the Clerk of Court and serve on all other parties written objections to the Report and Recommendation, specifically identifying the portion(s) of the proposed findings, recommendations, or report objected to, together with a memorandum of law setting forth the basis for such objection(s).  Any response by an opposing party to the written objections shall be filed within ten (10) days after the opposing party has been served with the objections.  *See* Fed. R. Civ. P. 72(b).  A party's failure to make objections in accordance with the procedure outlined above may result in a forfeiture of his rights on appeal.  *See Thomas v. Arn,* 474  U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

24